# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

KEVIN FITZGERALD, et al.,　　　　　　)
　　　　Plaintiffs,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　　)　　　Civil Action No. 1:07cv1117
　　　　　　　　　　　　　　　　　　)
FAIRFAX COUNTY SCHOOL BOARD,　　)
　　　　Defendant.　　　　　　　　　)

FILED

MAY 2 3 2008

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## MEMORANDUM OPINION

In this IDEA[1] dispute, plaintiff Kevin Fitzgerald (a minor child) and his parents challenge the procedures and finding of the manifestation determination review ("MDR") held by Fairfax County School Board ("FCSB")[2] that allowed Kevin to be suspended from his school for his involvement in a paintball shooting incident at the school. Specifically, plaintiffs contend that FCSB violated the IDEA's procedural provisions in conducting the MDR hearing; they also claim that Kevin's conduct was caused by, or had a direct relationship to, Kevin's disability and hence his suspension from school was an impermissible punishment under the IDEA. The parties filed cross-motions for judgment on the administrative record and for the following reasons, defendant's motion must be granted and plaintiffs' motion must be denied.

---

[1] The Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, 118 Stat. 2647 (2004) (codified as amended at 20 U.S.C. § 1400 *et seq.* (2005)), amended the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* (1997). Where differences between the 2004 and 1997 versions of the statute are relevant, they are specifically noted.

[2] Under the terms of the IDEA, FCSB is the "local education agency," or "LEA." 20 U.S.C. § 1401(19).

**I.**

In the eighth grade, Kevin, now a senior at Annandale High School, began exhibiting elevated anxiety symptoms, including crying, panic attacks, sweating, tics, and chronic headaches. Because these symptoms interfered with his school attendance and performance, Kevin underwent an evaluation, as a result of which he was categorized as a student with an emotional disability eligible to receive special education services under the IDEA.[3] Pursuant to the IDEA, Kevin's school, in cooperation with his parents, developed an Individualized Education Plan ("IEP") for Kevin, designed to ensure that he received the free appropriate public education ("FAPE") mandated by the IDEA.[4] Also pursuant to the IDEA, Kevin's school, again in cooperation with his parents, revised the IEP annually to accommodate Kevin's changing educational needs.

After successfully completing the eighth grade, Kevin began attending Falls Church High School ("FCHS"), where, pursuant to his IEP, he continued receiving special education services. His tenth grade IEP, prepared in April 2005, noted that Kevin had "been drawn into inappropriate behaviors in some of his classes and has been known to be negative and sarcastic toward teachers." As a result, included among the 2005 IEP's objectives for Kevin were to "refrain from conversation with peers that is not on topic of class lesson" and to "distance himself from peers who are behaving inappropriately in class." His eleventh grade IEP, which issued in March 2006 and was in effect at

---

[3] Kevin has also been diagnosed with Tourette's Syndrome, Attention Deficit Hyperactivity Disorder (ADHD), Generalized Anxiety Disorder (GAD), and Obsessive Compulsive Disorder (OCD).

[4] *See* 20 U.S.C. § 1400(d)(1)(A) (stating that one of the purposes of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living").

the time of the paintball shooting incident, expressed similar concerns and included a similar objective. The 2006 IEP also provided that Kevin receive one half hour of educational services per school week in addition to his otherwise normal classroom schedule. At Kevin's request, his meeting times with his special education case manager, Pamela Wallace, were scheduled so that he would not be called out of class or otherwise singled out in front of his peers as a student receiving special education services. The services appeared to be working for Kevin, as teachers noted an improvement in his leadership qualities and maturity level.

During his eleventh grade year, Kevin engaged in the conduct that is central to this dispute. On December 16, 2006, Kevin and some friends met at a restaurant. At Kevin's suggestion, the boys decided to drive by FCHS and shoot at the school building with paintball guns.[5]  Kevin had a paintball gun in his car and offered to drive the four other boys to the school. On the way to the school, Kevin made a detour to another boy's vehicle to retrieve two more paintball guns. The five boys then proceeded to FCHS in Kevin's car where they shot paintballs at the windows of the school building and at various vehicles parked on school property, including school buses. At some point during this first visit to the school, one of the paintball guns malfunctioned, so Kevin drove the boys to retrieve supplies, including $CO_2$ and more paintballs, from a vehicle belonging to one of the boys. Kevin and the boys then made a second trip to the school and this time Kevin, who was driving, shot at the school while one of the boys held the wheel of Kevin's car. After this second trip, two of the boys decided to leave and asked Kevin to drive them to another location. Kevin did so, and then he

---

[5] Plaintiffs deny that Kevin was the mastermind of the paintball incident, but three of the four other boys involved in the incident told the school police officer who investigated the incident that it was Kevin's idea to shoot at the school with paintball guns. *See* Due Process Transcript at 217. This is amply supported by the administrative record. *See infra* Part IV.

and the remaining two boys returned to FCHS to shoot paintballs at the school a third time. As a result of the three attacks on the school, thirty school windows, two school buses, and one school delivery truck had been hit with paintballs. On their way home from the school, Kevin, still driving, failed to obey a stop sign and was stopped by a police officer. The officer noticed the paintball guns and questioned the boys, who denied any wrongdoing. The officer then allowed Kevin and the boys to proceed on their way. Later, when the officer heard reports of paintball vandalism at FCHS, he advised the administration and school police officer, Officer George Davis, that he believed Kevin and his friends had been involved. Officer Davis then questioned Kevin, who, after Officer Davis assured him that the school was not planning to pursue criminal charges against the boys, admitted his involvement in the affair.

Virginia law requires the school board to "expel from school attendance for a period of not less than one year any student whom such school board has determined . . . to have possessed . . . a pneumatic gun as defined in [Va Code § 15.2-915.4(E)] on school property." Va. Code § 22.1-277.07(A). Because a paintball gun is statutorily defined as a type of pneumatic gun,[6] the school principal suspended Kevin with a recommendation of expulsion. This recommendation triggered the provisions of the IDEA, which prohibits disciplining a disabled student for more than ten days if the "conduct in question was caused by, or had a direct and substantial relationship to, the child's disability." 20 U.S.C. § 1415(k)(1)(E)(i)(II). Accordingly, school officials scheduled an MDR hearing for January 5, 2007, to determine whether Kevin's conduct in the paintball gun affair was a manifestation of his emotional disability. In accordance with FCSB policies, which required the attendance of certain categories of school personnel at an MDR hearing, the school designated the

---

[6] Va. Code § 15.2-915.4(E).

-4-

following people to participate in the MDR hearing: (i) Karen Allison, the special education department chair, (ii) Daniel Eberling, the assistant principal who handled the investigation of the paintball gun incident, (iii) Pamela Wallace, Kevin's special education teacher, (iv) Emily Trudeau, Kevin's eleventh-grade History teacher, and (v) Sonja Hamilton, a school psychologist.

Ms. Allison, on behalf of the school and FCSB, sent Kevin's parents the district's "Parent Notification of Manifestation Determination Review Meeting" form, advising Kevin and his parents of the date of Kevin's MDR hearing and listing the categories of school personnel who would be attending, without naming specific individuals.  The form also explained that "[a]dditional individuals may attend at the request of the parent or FCPS [Fairfax County Public Schools]." Included with the Parent Notification was the Virginia Department of Education's "Virginia Procedural Safeguards Notice."  The notice advised plaintiffs that Kevin could not be disciplined for more than ten days unless "the school division, the parent, and relevant members of the IEP Team (as determined by the parent and the school division)" determined that Kevin's conduct was not a manifestation of his disability.  Ms. Allison did not speak with Kevin or his parents concerning the MDR procedures, believing the materials she had sent adequately described their procedural rights. Similarly, Kevin's parents did not contact Ms. Allison or anyone else at FCHS for clarification or additional information on the procedures, nor did they bring anyone — or seek to bring anyone — to the MDR hearing.

The MDR hearing was held on January 5, 2007, and was attended by the five FCSB members, Kevin, and his parents.  The parties dispute the length of the MDR hearing; at a later due process hearing, Kevin's father stated that the MDR hearing lasted only 10 minutes, whereas the FCSB members stated that it lasted 30 to 45 minutes.  The FCSB members' recollection is more

plausible, as the MDR hearing included a careful review of Kevin's record. As the FCSB members later testified at the due process hearing, the MDR hearing included a presentation by Ms. Hamilton of the history of Kevin's disability, his qualification for special education services under the IDEA, and his educational and cognitive test results. Due Process Transcript at 478-85. The record also reflects that the MDR committee members reviewed evidence regarding Kevin's disciplinary history and inspected reports from Kevin's teachers describing his behavior in class. *Id.* at 480-81, 484. Finally, the team discussed Kevin's involvement in the paintball incident. *Id.* at 352.

Although Kevin and his parents contended at the MDR hearing that Kevin's conduct in the paintball gun incident was a manifestation of his disability, they did not argue that Kevin had somehow been induced or inveigled by his classmates to participate in the paintball shooting incident. At the conclusion of the MDR hearing, the FCSB members determined, contrary to plaintiffs' view, that Kevin's behavior was not a manifestation of his disability. This MDR finding that Kevin's behavior was not a manifestation of his emotional disability allowed the school to discipline Kevin as it would any other student. 20 U.S.C. § 1415(k)(1)(C). Accordingly, the school principal's recommendation for expulsion was sent to a disciplinary hearing officer for the FCSB superintendent, who reviews all expulsion recommendations before they are sent to the school board. *See* Va. Code § 22.1-277.07(A). This hearing officer decided that the appropriate sanction was not expulsion, but rather suspension of Kevin for the remainder of his eleventh-grade year. Kevin's parents did not appeal this disciplinary decision.[7]

---

[7] Kevin and his parents had the right to appeal the suspension decision to FCSB under Va. Code § 22.1-277.05(A), but chose not to do so. Their decision to forego this appeal does not impair or affect their right to a due process hearing to review the manifestation determination proceedings under 20 U.S.C. § 1415(f) and (k)(3), nor to appeal the result of that due process hearing to a federal district court.

After the FCSB superintendent's hearing officer decided to suspend Kevin for the remainder of the year, Kevin's parents agreed that Kevin would enroll in a Computer Enhanced Instruction program to complete the remainder of that year's course work. Kevin successfully completed this program, and the hearing officer determined that Kevin could attend a regular Fairfax County public school other than FCHS for his senior year. Accordingly, Kevin's IEP team met on August 14, 2007, and decided that Kevin should attend Annandale High School. The IEP team specifically chose Annandale because it was near FCHS and because it would allow Kevin to continue taking culinary classes, which were then his principal interest.

On July 25, 2007, Kevin's parents invoked their right under the due process procedures of the IDEA to a review of the MDR determination that Kevin's behavior was not a manifestation of his disability. Additionally, they raised a number of procedural violations they alleged occurred during the MDR process. A two-day hearing was conducted on August 22 and 23, 2007, during which the appointed independent hearing officer ("IHO")[8] heard testimony from: (i) Brian Fitzgerald, Kevin's father; (ii) Kathleen Gannon-Tye, Kevin's ninth-grade English teacher; (iii) Officer Davis, the FCHS police officer who had investigated the paintball incident; (iv) Manoochehr Masghati, Kevin's eleventh-grade Algebra teacher; (v) Ms. Trudeau, Ms. Wallace, Ms. Hamilton, and Ms. Allison, from Kevin's MDR committee; and (vi) James D. Anderson, the administrative disciplinary hearing officer who had determined Kevin should be suspended for the remainder of the year rather than expelled.

---

[8] In Virginia, IHOs are lawyers appointed by the Executive Secretary of the Supreme Court of Virginia to serve as hearing officers in IDEA due process hearings. *See generally* Hearing Officer Sys. Rules of Admin., http://www.courts.state.va.us/publications/hearing_officer.html (last visited May 21, 2008); *see also* 20 U.S.C. § 1415(f)(3)(A); Va. Code § 2.2-4024; 8 Va. Admin. Code § 20-80-76.

Following the hearing, the IHO issued a 27-page opinion, finding that no IDEA violations had occurred in connection with Kevin's MDR hearing. Further, the IHO found that even assuming a technical violation had occurred, any such procedural inadequacies did not deny Kevin a FAPE under the terms of 20 U.S.C. § 1415(f)(3)(E)(ii).[9] Finally, the IHO concluded that Kevin's conduct was not a manifestation of his disability. For all these reasons, the IHO ruled in favor of FCSB in all respects.

Thereafter, on November 5, 2007, plaintiffs filed the complaint in this action, *inter alia*, seeking (i) the vacation of the IHO's decision, (ii) a finding that Kevin's conduct was a manifestation of his disability, (iii) an order requiring the removal of Kevin's suspension from his scholastic and disciplinary records, and (iv) an order reinstating Kevin as a non-probationary student. Specifically, plaintiffs contend that the IHO erred in finding that FCSB did not violate their procedural rights under the IDEA and that Kevin's conduct was not a manifestation of his disability. The parties filed cross-motions for judgment on the administrative record. These motions, having been fully briefed and argued, are now ripe for disposition.

## II.

To begin with, it is appropriate to set forth the standard of review district courts must apply

---

[9] 20 U.S.C. § 1415(f)(3)(E)(ii) provides:

In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies--

(I) impeded the child's right to a free appropriate public education;
(II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or
(III) caused a deprivation of educational benefits.

in reviewing an appeal from an IHO's decision in an IDEA dispute. It is well-settled and undisputed by the parties that a district court reviewing a state administrative decision under the IDEA may grant a motion for judgment on the administrative record. *See County Sch. Bd. of Henrico County, Va. v. Z.P. ex rel. R.P.*, 399 F.3d 298, 309 n.7 (4th Cir. 2005). And in reviewing the administrative decision, a district court engages in a modified *de novo* review, making an "independent decision based on the preponderance of the evidence," while at the same time giving due weight to the administrative findings. *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 103 (4th Cir. 1991). Because a district court does not have the same opportunity to hear and observe the witnesses as they testify, and thus to assess the weight and credibility of evidence presented at the hearing, the IHO's administrative findings of fact are considered *prima facie* correct, and the district court must explain its reasoning if it chooses not to follow those findings. *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 325-28 (4th Cir. 2004); *see also J.P. ex rel. Peterson v. County Sch. Bd. of Hanover County, Va.*, 516 F.3d 254, 259-60 (4th Cir. 2008). This deference is limited to the IHO's factual findings, and thus a district court must make an independent, *de novo* determination of the IDEA's legal requirements. *See Doyle*, 953 F.2d at 105 (noting that the "due weight" requirement requires deference to the state administrative authorities' factual findings); *A.W. ex rel. Wilson v. Fairfax County Sch. Bd.*, 372 F.3d 674, 677 (4th Cir. 2004) (reviewing *de novo* "the district court's interpretation of the IDEA"). Finally, it is well-established that the party challenging the administrative decision bears the burden of establishing that the administrative decision was erroneous. *Schaffer v. Weast*, 546 U.S. 49 (2005); *A.K. ex rel. J.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672 (4th Cir. 2007). These general principles provide the lens through which a court reviews the administrative IDEA record.

## III.

Analysis of plaintiffs' claims appropriately begins with the recognition that the IDEA requires all public schools to provide every disabled child a FAPE. 20 U.S.C. § 1400(d)(1)(A). A school fulfills this obligation when it provides that child "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Board of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 203 (1982). This is accomplished, in part, through the requirement that each disabled child have an IEP that is "reasonably calculated to enable the child to receive educational benefits." *Id.* at 207; *see also* 20 U.S.C. § 1414(d). Importantly, the IDEA does not rely solely on the IEP requirement to achieve the goal of a FAPE; additionally, the IDEA provides a range of procedural safeguards to ensure parental participation in the process. Indeed, "Congress placed every bit as much emphasis on compliance with procedures giving parents . . . a large measure of participation at every stage of the administrative process . . . as it did upon the measurement of the resulting IEP against a substantive standard." *Rowley*, 458 U.S. at 205-06. This reflects, as courts have recognized, that "[t]he core of the statute . . . is the cooperative process that it establishes between parents and schools." *Schaffer*, 546 U.S. at 53 (citing *Rowley*, 458 U.S. at 205-06).

While this focus on parental involvement is understandable based on the IDEA's goals, there is a difference between parental involvement and parental consent. Congress certainly intended parents to be involved in the decisions regarding the education of their disabled child; nevertheless, this participation does not rise to the level of parental consent or a parental veto power absent an explicit statement by Congress. *See, e.g.*, 20 U.S.C. § 1414(a)(1)(D); 34 C.F.R. 300.300 (requiring

-10-

parental consent for initial evaluations, the provision of special education services, and reevaluations). Put differently, the IDEA is designed to ensure parental participation in decisions regarding their disabled child, but it does not ordinarily require parental consent such that parents may usurp or otherwise hinder an LEA's authority to educate and discipline disabled children.[10]

Finally, it is clear that a procedural violation of the IDEA is not alone sufficient to show a school failed to provide a child with a FAPE. Thus, a "presumably correct finding" concerning a child with a disability will not be overturned simply because the IDEA's procedural requirements were not strictly followed; rather, the violation must "*actually interfere* with the provision of a FAPE to that child." *DiBuo v. Bd. of Educ. of Worcester County*, 309 F.3d 184, 190 (4th Cir. 2002) (emphasis in original). Put differently, the inquiry does not end when a court finds a procedural violation of the IDEA; instead, a court must then determine "whether [the procedural violation] resulted in the loss of an educational opportunity for the disabled child, or whether, on the other hand, it was a mere technical contravention of the IDEA." *M.M. ex rel. D.M. v. Sch. Dist. of Greenville County*, 303 F.3d 523, 533 (4th Cir. 2002); *see also* 20 U.S.C. § 1415(f)(3)(E)(ii); *Farrin v. Maine Sch. Admin. Dist. No. 59*, 165 F. Supp. 2d 37, 43-44 (D. Me. 2001) ("When the crux of an appeal is a procedural blunder in applying the IDEA, a harmless error standard applies.").[11]

---

[10] Recognizing this distinction, courts have repeatedly rejected the notion that the IDEA's focus on parental participation gives parents the power to control or veto educational decisions related to their disabled child. *See, e.g., A.W. ex rel. Wilson v. Fairfax County Sch. Bd.*, 372 F.3d 674, 683 n.10 (4th Cir. 2004) (stating that "the right conferred by the IDEA on parents to participate in the formulation of their child's IEP does not constitute a veto power over the IEP Team's decisions") (citing *White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 380 (5th Cir. 2003)).

[11] This well-established principle precludes the Fitzgeralds' argument that a determination of an MDR committee should be overturned for *any* violation of 34 C.F.R. § 300.530, the regulation setting forth certain procedures for disciplining students with disabilities. In support of their argument, plaintiffs rely on 34 C.F.R. § 300.532, which states that a hearing officer "*may* . . . return

Here, plaintiffs contend that FCSB violated the IDEA's procedural requirements in the following ways:

1.      violating plaintiffs' right to determine who would serve on Kevin's MDR committee;

2.      choosing people to serve on Kevin's MDR committee who were not relevant members of Kevin's IEP team;

3.      violating plaintiffs' right to determine whether Kevin's conduct was a manifestation of his disability;

4.      failing to require all MDR committee members to review all relevant information in Kevin's file before the MDR hearing; and

5.      violating plaintiffs' right to a fundamentally fair MDR by allowing certain MDR committee members to meet and discuss Kevin's case before the formal MDR hearing.

Each of these contentions is separately addressed.

### A.

Plaintiffs first claim that FCSB violated the IDEA by denying plaintiffs, in their words, their "equal right" to determine the individuals who would attend Kevin's MDR hearing. Essentially, plaintiffs contend the IDEA requires that parents consent to the composition of the MDR committee. In support of their argument, plaintiffs rely on the text of § 1415(k), which states that the MDR hearing is to be conducted by "the local education agency ["LEA"], the parent, and relevant members of the IEP Team (*as determined by the parent and the local education agency*)." § 1415(k)(1)(E)(i)

_____

the child with a disability to the placement from which the child was removed if the hearing officer determines that the removal was a violation of § 300.530 or that the child's behavior was a manifestation of the child's disability." 34 C.F.R. § 300.532(b)(2)(I) (emphasis added). Because this regulation is plainly permissive, not mandatory, it does not conflict with or overrule well-settled precedent that technical procedural violations of the IDEA do not require vacation of an MDR determination unless there is a further showing that the violation deprived a child of a FAPE. *See M.M.*, 303 F.3d at 533.

(emphasis added).

Plaintiffs misread this statutory provision by failing to read it, as required, in the context of the IDEA's statutory scheme as a whole.[12]  When read in light of the IDEA's other pertinent provisions and overall scheme, the § 1415(k) language — "as determined by the parent and the [LEA]" — plainly does not mean, as plaintiffs argue, that parents and the LEA must agree on the identity of all MDR members, or put differently, that parents have a veto on MDR members. Rather, when other provisions are considered, it becomes clear that the § 1415(k) language means that the LEA determines the school system's MDR members and the parents may determine whom they wish to invite in addition to those designated by the school and the LEA.

The analysis leading to this conclusion begins with noting that § 1415(k) does not name specific individuals who must make a manifestation determination concerning a disabled child, but instead defines the attendees as "the local education agency, the parent, and relevant members of the IEP Team." § 1415(k)(1)(E)(i).  The MDR committee is thus a subset of a disabled child's IEP team,[13] and analysis must therefore turn to the portion of the IDEA defining an IEP team.  And in this regard, the IDEA sets forth particular categories of individuals who must serve on the IEP team, namely (i) the child's parents; (ii) at least one of the child's regular education teachers; (iii) at least one of the child's special education teachers; (iv) a representative of the LEA who is qualified to

---

[12] *See A.W.*, 372 F.3d at 681 (reviewing other portions of the IDEA to determine the meaning of a term that is "most harmonious with [the IDEA's] scheme") (quoting *Comm'r v. Engle*, 464 U.S. 206, 217 (1984)).

[13] The statute's plain language contradicts plaintiffs' assertion that a child's MDR committee is a "separate and distinct entity from his IEP team." Plaintiffs' Reply Brief at 4. The IDEA clearly defines the MDR attendees by reference to the child's IEP team, § 1415(k)(1)(E)(i), and the term "MDR team" does not appear anywhere in the IDEA or the related regulations.

either provide or supervise special education instruction and who is knowledgeable about the school's general education curriculum and other available resources; (v) someone "who can interpret the instructional implications of evaluation results," but who otherwise may be one of the aforementioned individuals; (vi) any other individuals "who have knowledge or special expertise regarding the child," who may attend "at the discretion of the parent or the [LEA]"; and (vii) the child, when appropriate. 20 U.S.C. § 1414(d)(1)(B). Thus, the IEP team is comprised of school personnel, the parents (and child, if appropriate), and other individuals who may attend at either the LEA's or the parents' discretion. And significantly, neither § 1414, nor any other IDEA provision, gives parents veto power over which specific LEA or school personnel should serve on the IEP team. It is, therefore, an essential part of the IDEA scheme that the designation of specific school and LEA personnel to serve on the IEP team is the sole prerogative of the school and the LEA. And because the MDR committee is a subset of the IEP team, this principle applies equally to the MDR committee as to the IEP team. Thus, the § 1415(k) language to the effect that the MDR hearing is conducted by the relevant members of the child's IEP team "as determined by the parents and the [LEA]" means that parents have the right to determine whom they wish to invite to attend the MDR hearing, but they do not have the right to dictate the identity of the school or LEA personnel who attend; that is the sole prerogative of the school or LEA.[14]

---

[14] Other IDEA provisions suggest that parents should also be consulted if any statutorily-required IEP team members are to be absent from an MDR hearing. Thus, § 1414(d)(1)(C) allows members of the IEP team to be excused from an IEP meeting if the parent and the LEA consent to the absence in writing. Legislative history for this provision demonstrates Congress's recognition that requiring all IEP team members to attend all meetings concerning a disabled child may be unnecessary and onerous in some circumstances. See H. Rep. No. 108-77, at 110 (2003) (noting that the 1997 amendments to the IDEA "allow[] local educational agencies to better utilize their personnel who are not needed for a particular meeting"). Legislative history reflects a similar intent to streamline the MDR process, as the statute was amended in 1997 to require only "relevant"

This contextual interpretation of the § 1415(k) language finds further support in the Department of Education ("DOE") regulations and published guidance that make clear that "the public agency, not the parent, determines the specific personnel to fill the roles of the public agency's required participants at the IEP meeting." Questions and Answers on Individualized Education Programs (IEPs), Evaluations, and Reevaluations, 47 IDELR 166, at *4-5 (Office of Special Education and Rehabilitative Services 2007) (interpreting 34 C.F.R. § 300.321). Guidance from the Office of Special Programs ("OSEP") interpreting the notice provisions of the IDEA regulations states that an LEA need not even advise parents as to the specific individuals who will represent the school at the IEP meeting. *In re Letter to Livingston*, 21 IDELR 1060, at *2 (OSEP 1994) (interpreting 34 C.F.R. § 300.322). This DOE published interpretive guidance is persuasive confirmation [15] that parental consent is not required for the school and LEA personnel designated to serve on an IEP team and that parents' participation in determining the makeup of the IEP team is limited to inviting individuals who, in their opinion, "have knowledge or special expertise regarding the child." § 1414(d)(1)(B)(vi); 34 C.F.R. § 300.321(c); *see also Cone ex rel. Cone v.*

---

members of the IEP team to make manifestation determinations, as opposed to the entire IEP team. *Id.* at 116-20. Hence, if the LEA or school believes certain statutorily-required IEP team members are not essential to the MDR process, parents may need to consent before those persons may be excused. Here, plaintiffs do not argue that any statutorily-required persons were absent from Kevin's MDR hearing.

[15] An agency's interpretation of its own regulations is entitled to "substantial deference"; hence, "the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) (internal punctuation omitted). Here, the agency's regulations track closely the language of the IDEA.

-15-

*Randolph County Schools*, 302 F. Supp. 2d 500, 507 (M.D.N.C. 2004).[16]

Nor is there any doubt that this DOE guidance is equally applicable to MDR hearings, which are conducted by the LEA, the parents, and the "relevant members of the IEP Team." § 1415(k)(1)(E)(i). Because the MDR hearing is to be conducted by some or all of a child's IEP team, it follows that the group may include school personnel selected by the LEA, as well as individuals with special knowledge or expertise concerning the child who are selected by either the parents or the LEA, or both. Nothing in the text of § 1415 suggests an intent by Congress to change the manner in which the IEP team's members are selected when they are to conduct an MDR hearing rather than a review of the child's IEP.

In sum, a contextual reading of the § 1415(k) language together with the related DOE regulations and guidance makes clear that under § 1415(k) the LEA and parents "determine" IEP and MDR team members as follows: The LEA determines and designates the school and LEA personnel to serve on these teams and the parents "determine" any additional team members they may wish to invite. The manifest reasonableness of this conclusion is confirmed by the consequences of construing § 1415(k) to give parents an "equal right" to designate IEP and MDR team members — in other words a parental power to veto the LEA's designations. Such a reading of § 1415(k) could result in delays, stalemates, and impasses that would "leave educators hamstrung," a result neither intended by the IDEA, nor provided for in the statute. *See A.W.*, 372 F.3d at 680 (citing *Honig v. Doe*, 484 U.S. 305, 325 (1988)). Accordingly, the only sensible interpretation of the § 1415(k)

---

[16] It should be noted that this right does not allow parents to "'stack the deck' by inviting numerous additional participants who share[] the[ir] same views." *Doe by Gonzales v. Maher*, 793 F.2d 1470, 1489 (9th Cir. 1986). While the views of parents and their invited attendees must be considered, it is the duty of the LEA to formulate the child's IEP in the event consensus cannot be reached. *Id.* at 1490.

language is the one that rejects a parental veto power.[17]

Given the correct contextual reading of § 1415(k), it follows that no IDEA violations occurred in connection with the composition of Kevin's MDR committee. All statutorily-required IEP team members were present at the MDR hearing, namely (i) Kevin's parents; (ii) one of Kevin's regular education teachers (Ms. Trudeau); (iii) one of Kevin's special education teachers (Ms. Wallace); (iv) a representative of the LEA (Ms. Allison and/or Mr. Ebeling); and (v) an individual qualified to "interpret the instructional implications of evaluation results" (Ms. Allison and/or Ms. Hamilton).  *See* § 1414(d)(1)(B).  Moreover, the LEA and school provided plaintiffs with ample notice that they were entitled to bring other individuals to the MDR hearing.  Specifically, the Parent Notification of Manifestation Determination Review Meeting form stated that "[a]dditional individuals may attend at the request of the parent or FCPS."  The attached Virginia Procedural Safeguards Notice tracked the language of § 1415 almost exactly by stating that "the school division, the parent, and relevant members of the IEP Team (as determined by the parent and the school division)" were to determine whether Kevin's conduct was a manifestation of his disability.  After reading this information, plaintiffs did not attempt to invite anyone to the MDR hearing.  They

---

[17] The plaintiffs' cited authority to the contrary is unpersuasive.  The cases are not binding authority, as they are state educational agency decisions from other jurisdictions.  *See Philadelphia City Sch. Dist.*, 47 IDELR 56, at *3 (SEA, Pa. 2007); *Maple Heights City Sch. Dist.*, 107 LRP 28576 (SEA, Ohio 2007) (*Maple Heights I*); *Maple Heights City Sch. Dist.*, 107 LRP 38499 (SEA, Ohio 2007) (affirming *Maple Heights I*).  More importantly, these cases are factually distinguishable because the decisions to overturn manifestation determinations in those cases were based on findings of multiple procedural violations of the IDEA and other serious errors.  Finally, the reasoning of these cases is unpersuasive because they do not explain why a parent has an "equal right" to determine the MDR committee's membership, but simply cite the text of the statute, which, as explained herein, cannot be read as plaintiffs urge.

cannot now complain simply because they failed to avail themselves of this opportunity.[18]

Accordingly, plaintiffs' first procedural challenge to Kevin's MDR proceedings fails.

**B.**

Plaintiffs' next argue that the individuals selected to serve on the MDR committee were not "relevant members" of Kevin's IEP team as required by 20 U.S.C. § 1415(k)(1)(E)(i). In essence, plaintiffs claim is that "relevant members" is a sharply limited class of persons such that an individual may only be involved in a disabled child's manifestation determination if that individual knows the child personally and has previously served on one of the child's IEP teams. Based on this belief, plaintiffs object to the inclusion of the following individuals on Kevin's MDR committee: (i) Mr. Ebeling, who never served on any of Kevin's IEP teams either before or after the MDR hearing; (ii) Ms. Hamilton, who never served on any of Kevin's IEP teams and who had never met Kevin or examined him; (iii) Ms. Allison, who had never served on any of Kevin's prior IEP teams or met Kevin before this incident; and (iv) Ms. Trudeau, who had never served on Kevin's IEP teams before the MDR hearing, but who served on the IEP team that met immediately after Kevin's MDR hearing. Plaintiffs do not object to the inclusion of Ms. Wallace on the MDR committee.

Once again, plaintiffs' argument rests on a misreading of the statute. As already noted, all categories of individuals mandated by statute to be on a child's IEP team were present at Kevin's MDR hearing. *See supra* Part III.A. Accordingly, the only question is whether the IDEA requires

---

[18] Plaintiffs argue that even if they had invited another individual to the MDR hearing, the school would not have allowed that individual to help determine whether Kevin's conduct was a manifestation of his disability. This is so, according to plaintiffs, because Ms. Allison stated during the due process hearing that she believed only the votes of school personnel counted toward making a final manifestation determination. Due Process Transcript at 554-56, 561-62, 570. It is unnecessary to reach and decide whether Ms. Allison's view is correct inasmuch as plaintiffs did not invite anyone and the issue is therefore not presented.

those roles to be filled on an MDR committee by persons who had both (i) served in those roles in one of the child's previous IEP meetings, and (ii) personally knew the child. The IDEA does not so require. First, the IDEA's categories of individuals who must attend a child's IEP meeting demonstrates Congress's intent to include *both* individuals who know the child personally and individuals who have certain professional expertise, but need not know the child personally. In the former category, the IDEA requires an IEP team to include the child's parents, at least one of the child's special education teachers, and at least one of the child's general education teachers. *Id.* These individuals know the child personally and have regular contact with him. In the latter category, the IEP team must also include a representative of the LEA who is qualified to provide or to supervise special education instruction and who is knowledgeable about the school's general education curriculum and other available resources. *Id.* There is no requirement that this category of persons know the child personally. This category may include an administrator or a special education department chair, who may well not know the disabled child personally or have regular contact with the disabled child. Similarly, the IDEA requires an individual "who can interpret the instructional implications of evaluation results" to serve on the IEP team. *Id.* While this role may be filled by one of the other statutorily-required members, it may also be filled by a school psychologist or other individual with special education training, who may or may not personally know the disabled child. Hence, the first three categories of individuals required to attend an IEP meeting are defined based on their relationship to the student, while the fourth and fifth categories are defined based on their specific knowledge and expertise. Accordingly, the § 1415(k) language stating that only relevant members of the IEP team need attend an MDR hearing does not support the proposition that each MDR committee member must know the student personally; rather, each

committee member must serve some purpose pertinent to the MDR.

Here, Kevin's parents, Ms. Wallace, and Ms. Trudeau all knew Kevin personally and had regular contact with him. By contrast, Ms. Hamilton, Ms. Allison, and Mr. Eberling, although not familiar with Kevin personally, brought specific, relevant areas of expertise to bear on the MDR process. Kevin's parents and teachers could describe Kevin's day-to-day behavior and how his disability manifested itself in class, whereas Ms. Hamilton, Ms. Allison, and Mr. Eberling could provide more specific pertinent information relevant to the MDR. Ms. Hamilton, as a school psychologist, was familiar with emotional disabilities and explained to the other members of the team the basis for Kevin's classification as a child with an emotional ability and how such disabilities typically manifest themselves in children. As Special Education Department Chair, Ms. Allison was familiar with the school's special education and general education programs. Finally, Mr. Eberling was the school administrator who investigated the paintball incident, which made his presence obviously relevant to the discussion. In sum, then, each of the individuals on Kevin's MDR committee served some pertinent purpose.

Nor is there any support for plaintiffs' proposition that all individuals involved in the MDR must have served on one of the child's previous IEP teams. Plaintiffs do not cite to a single case in support of this proposition, nor has any been found. This is hardly surprising because requiring every MDR committee member to have served on the child's IEP teams and to have had personal interactions with the student would pose many practical problems, especially considering that MDR hearings must be held within ten days of the decision to suspend the child for more than ten days. *See* § 1415(k)(1)(E)(i). Such practical difficulties were considered by the drafters of the 2004 IDEA amendments, which were designed in part to streamline IEP and MDR processes. *See* H. Rep. No.

108-77, at 110-11, 116-20 (2003) (noting that a "top goal" of the amendments was to "reduce the unnecessary complications and processes involved in the IEP" and to avoid "[tying] the hands of school personnel in responding quickly and effectively to very serious student behavior problems"). A requirement that an LEA must convene, within ten days of a decision to discipline a disabled child, an MDR committee comprised only of persons who know the child personally and who have served on one of his previous IEP teams is inconsistent with the streamlining purpose of the IDEA's amendments.

Moreover, as plaintiffs concede, IEP team membership is not static, and different individuals may fill — and, in Kevin's case, have filled — a particular statutory role in different IEP meetings. It may or may not be ideal to have the same teachers and school representatives appear at every IEP and MDR hearing for the child, but it is undeniably neither practical nor required. Contrary to plaintiffs' contention, it does not follow from this conclusion that anyone can be a relevant member of the child's IEP team. As already explained, the composition of an MDR committee is constrained by the specific categories of individuals mentioned in § 1414. A child only has a finite number of special education and regular education teachers, and it is doubtful that LEAs have an endless supply of personnel who could fill the more specialized roles on the IEP team.

No doubt plaintiffs probably preferred different individuals to fill the IDEA's statutory categories, but as already noted, nothing in the statute allows parents to choose the school personnel they prefer. *See supra* Part III.A. If plaintiffs wanted additional teachers or school psychologists who knew Kevin better to attend the MDR hearing, they could have invited them. Accordingly, this procedural claim fails.

-21-

## C.

Next, plaintiffs contend that FCSB violated the IDEA by failing to give plaintiffs an "equal right" to determine whether Kevin's conduct was a manifestation of his disability. In support of their claim, plaintiffs again rely on the text of § 1415, which states that the LEA, the parents, and the relevant members of the IEP team are to meet "to determine . . . if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability."     § 1415(k)(1)(E)(i)(I). It is unclear whether plaintiffs believe this language gives parents a right to vote at an MDR hearing, or whether they believe it requires a manifestation determination to be unanimous. Regardless, either claim would fail. First, as a factual matter, the record reflects that plaintiffs participated at the hearing and voiced their belief that Kevin's conduct was a manifestation of his disability. Thus, they apparently did, in this sense, have an opportunity to "vote" on the issue.

More importantly, as already noted, the IDEA's emphasis on parental involvement does not give parents the right to veto or otherwise block the LEA's ability to implement an IEP or to discipline a student.[19] Parents have a right to participate and be heard in the MDR hearing, but these proceedings may become adversarial, as parents may well disagree with the school's decision to

---

[19] See A.W. ex rel. Wilson v. Fairfax County Sch. Bd., 372 F.3d 674, 683 n.10 (4th Cir. 2004) ("Although AW's parents indicated their dissatisfaction with AW's April IEP by declining to sign it, the right conferred by the IDEA on parents to participate in the formulation of their child's IEP does not constitute a veto power over the IEP team's decisions."); White v. Ascension Parish Sch. Bd., 343 F.3d 373, 380 (5th Cir. 2003) ("Congress could have included [a parental veto] power in the IDEA; it did not do so. The right to provide meaningful input is simply not the right to dictate an outcome and obviously cannot be measured by such."); B.B. ex rel. J.B. v. Haw. Dep't of Educ., 483 F. Supp. 2d 1042, 1050-51 (D. Haw. 2006) ("The IDEA does not explicitly vest within parents a power to veto any proposal or determination made by the school district or IEP team regarding a change in the student's placement. Rather, the IDEA requires that parents be afforded an opportunity to participate in the IEP process and requires the IEP team to consider parental suggestions.") (internal citations omitted).

discipline their child. If parents were required to consent to the LEA's determination, or if parents were allowed to "stack the deck"against the LEA by inviting several individuals who would vote consistently with the parents' views,[20] the LEA would effectively be hamstrung, a result not contemplated by the IDEA. *See A.W.*, 372 F.3d at 680 (citing *Honig v. Doe*, 484 U.S. 305, 325 (1988)). Accordingly, the IDEA does not require the LEA and the parents to reach a consensus regarding the education or discipline of a disabled child.[21] Instead, if a consensus cannot be reached, the LEA must make a determination, and the parents' only recourse is to appeal that determination.[22]

In conclusion, consensus may be desirable as a goal, but cannot always be reached and is not statutorily required. All the statute requires is parental involvement in the MDR process. Here, the record reflects that plaintiffs attended and participated in Kevin's MDR hearing. Plaintiffs' procedural claim on this ground must therefore fail.

### D.

Plaintiffs next contend that FCSB violated the IDEA by failing to require all members of Kevin's MDR committee to review all "relevant information" in his student file before the MDR

---

[20] *Doe by Gonzales v. Maher*, 793 F.2d 1470, 1489 (9th Cir. 1986) (noting that parents may not "'stack the deck' by inviting numerous additional participants who share[] the[ir] same views").

[21] *See Doe*, 793 F.2d at 1489 ("Decision by consensus has little utility with respect to issues whose intensely emotional nature makes reconciliation impossible."); *see also Sch. Comm. of the Town of Burlington, Mass. v. Dep't of Educ. of the Commonwealth of Mass.*, 471 U.S. 359, 368 (1985) (noting that the IDEA's "cooperative approach [does] not always produce a consensus between the school officials and the parents").

[22] 34 C.F.R. § 300.532(a) ("The parent of a child with a disability who disagrees with . . . the manifestation determination under § 300.530(e) . . . may appeal the decision by requesting a hearing."); *see also* Questions and Answers on Discipline Procedures, 47 IDELR 227, at *5-6 (OSERS 2007) (advising that if the parents and the LEA "cannot reach consensus or agreement on whether the child's behavior was or was not a manifestation of the disability, the public agency must make the determination").

hearing. *See* 20 U.S.C. § 1415(k)(1)(E)(i). In this respect, plaintiffs point to Ms. Allison's testimony that she did not make copies of Kevin's student file for each of the MDR members, but instead had the file available in her office for their review. The IHO found that the MDR committee members conducted a "reasonable review of relevant information" and that "[e]ach school member of the team had access to information commensurate with that member's background." IHO Opinion at 19. The legal standard governing what information must be reviewed by the MDR committee is a question of law which a district court must answer *de novo*, but the IHO's factual finding regarding the information actually reviewed by the MDR committee members is entitled to deference. *See supra* Part II.

As an initial matter, plaintiffs cite no authority for the proposition that all MDR committee members must review every piece of information in the student's file before an MDR hearing.[23] Rather, the statute requires that the MDR committee "shall review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents" to make its manifestation determination. § 1415(k)(1)(E)(i). This language does not require each member to read before the meeting every piece of information in the student's file. All the statute requires is that, before reaching a manifestation determination, the team must review the information pertinent to that decision, including the child's IEP, his teachers' comments, and any information provided by the parents. And this review clearly may occur before or during the course of an MDR hearing.

The record reflects that Kevin's MDR committee did just that. While some members may

___

[23] Plaintiffs again rely on *Philadelphia City Sch. Dist.*, 47 IDELR 56, at *3 (SEA, Pa. 2007), but that case is distinguishable because the IHO's decision was reversed largely because he relied on an incorrect legal standard and reached the wrong substantive manifestation determination.

-24-

not have reviewed information before the MDR hearing, Ms. Hamilton and Ms. Allison discussed Kevin's case with Ms. Wallace, who the parents concede was familiar with Kevin. Then, at the MDR hearing, Ms. Hamilton discussed emotional disabilities in general and the bases for Kevin's classification as a student with a disability under the IDEA. Ms. Wallace and Ms. Trudeau discussed Kevin's behavior in class. The team also reviewed written teacher evaluations and Kevin's 2006 IEP. At the due process hearing on this matter, the only other information plaintiffs said they would have had the team consider was Kevin's 2005 IEP. This document was similar in nearly every respect to the 2006 IEP, and plaintiffs have set forth no reason why they believe the outcome of Kevin's MDR may have been different if the 2005 IEP had also been reviewed. *See M.M. ex rel. D.M. v. Sch. Dist. of Greenville County*, 303 F.3d 523, 533 (4th Cir. 2002) (distinguishing between procedural violations that deny a child a FAPE and those that are "mere technical contravention[s] of the IDEA").

Accordingly, the IHO correctly determined that the MDR committee satisfied the IDEA's mandate to review all relevant information in Kevin's file before making a manifestation determination, and this procedural claim fails.

**E.**

Plaintiffs' final procedural argument is that FCSB violated plaintiffs' right to a fundamentally fair MDR process when the MDR committee members, including Ms. Wallace, Ms. Hamilton, and Ms. Trudeau, met informally to discuss Kevin's MDR before the formal MDR hearing. In short, plaintiffs believe school personnel may not discuss a child's manifestation determination before the formal MDR hearing unless the child's parents are also present. Plaintiffs cite no statute, regulation, or case law in support of their argument, but rely on *Goss v. Lopez*, 419 U.S. 565, 574 (1975), for

the general proposition that schools must employ "fundamentally fair procedures" when disciplining students.

As an initial matter, nothing in *Goss* precludes school personnel from discussing a disabled child's case before a formal meeting, but other case law does make clear that "if the school system has already fully made up its mind before the parents ever get involved, it has denied them the opportunity for any meaningful input." *Doyle v. Arlington County Sch. Bd.*, 806 F. Supp. 1253, 1262 (E.D. Va. 1992), *aff'd* 39 F.3d 1176 (4th Cir. 1994) (unpublished). Accordingly, "school officials must come to the IEP table with an open mind" and must not make a final determination regarding a disabled child before fully discussing the issues with the child's parents. This does not, however, require school officials to "come to the IEP table with a blank mind." *Doyle*, 806 F. Supp. at 1262. The district court's opinion in *Doyle* is instructive on this distinction. There, the court found no error in the school's research of particular placement options for the disabled child before the child's IEP meeting. The court noted that "while a school system must not finalize its placement decision before an IEP meeting, it can, and should, have given some thought to that placement." *Id.* Thus, the court found no unlawful predetermination of the child's placement, finding instead that the parents participated fully in drafting the IEP before any placement options were suggested and that the school was "receptive and responsive" to the parents' suggestions throughout the formulation of the child's IEP. *Id.*

Given that fairness requires open-mindedness, the key question in this case is whether the FCSB personnel merely discussed Kevin's case before the MDR hearing while remaining open-minded about the final determination, or whether they predetermined that Kevin's conduct was not a manifestation of his disability. Plaintiffs claim FCSB "unlawfully predetermined the result of

-26-

Kevin's MDR," relying heavily on the draft IEP Ms. Wallace prepared for the IEP meeting scheduled for immediately after Kevin's MDR hearing. Ms. Wallace admitted that she prepared only one draft IEP for that meeting, and that the draft IEP predicted that the MDR committee would find that Kevin's conduct was not a manifestation of his disability. This is evident, as the draft IEP recommended home placement, which was possible only if Kevin's conduct was determined not to be a manifestation of his disability. *See* 34 C.F.R. § 300.530(f)(2) (requiring an IEP team to "return the child to the placement from which the child was removed" upon a finding that his behavior was not a manifestation of his disability).

After hearing and reviewing evidence on this point, the IHO concluded that FCSB did not unlawfully predetermine the outcome of the MDR. In this regard, the IHO noted that an "MDR meeting is not designed to be a jury trial where the triers of fact are isolated from any knowledge of the facts of the case other than what is properly presented to them." IHO Opinion at 20. To the contrary, some MDR committee members, unlike a jury, are statutorily required to have certain knowledge of the matter. In any event, the IHO rejected plaintiffs' contention that the school personnel came to the MDR hearing with the outcome predetermined and found "reasonable" Ms. Wallace's testimony that her preparation of the draft IEP was simply a "time saving exercise to improve the efficiency of the MDR." *Id.* This finding by the IHO, while not explicitly stated as such, appears to be a determination that the IHO found credible Ms. Wallace's testimony that the draft IEP was not a predetermination of the outcome of Kevin's MDR. Credibility determinations are entitled to deference. *See A.B. ex rel D.B. v. Lawson*, 354 F.3d 315, 325-28 (4th Cir. 2004). Indeed, the record reflects this credibility determination was sound. Ms. Wallace's draft IEP does not alone demonstrate that FCSB had predetermined the outcome of Kevin's MDR. Although she

-27-

prepared only one draft IEP, which predicted that the team would find Kevin's conduct not to be a manifestation of his disability, this was only a prediction. Ms. Wallace reasonably could have foreshadowed the outcome of Kevin's manifestation determination, given her experiences with him and her knowledge of his misconduct. That one FCSB employee was leaning toward a particular conclusion does not mean her mind was closed to a different conclusion. Similarly, jurors may sometimes form tentative opinions about a case before hearing the evidence; such opinions are perfectly acceptable so long as the jurors remain open-minded and render an impartial decision based only on the material presented before them. *See, e.g., United States v. Barber*, 668 F.2d 778, 786 (4th Cir. 1982) (finding no reversible error where a juror stated that "he might have been inclined towards a finding of guilt, but had put any such inclination aside and would consider the evidence as the only basis for his decision"). Here, had the MDR committee concluded, after careful consideration, that Kevin's conduct was a manifestation of his disability, Ms. Wallace would simply have drafted a different IEP.

The record makes clear that the MDR committee did not approach the hearing with closed minds, but rather carefully considered all information at the hearing *before* making their determination. Thus, testimony at the due process hearing reflects that at the MDR hearing, Ms. Hamilton presented a history of Kevin's disability and why he qualified for special education services under the IDEA. She also presented evidence about Kevin's educational and cognitive test results. The team also reviewed (i) Kevin's disciplinary history, (ii) his behavior in classes, contained in teachers' reports, and (iii) his involvement in the paintball incident. Due Process Transcript at 478-85. That the school board members had not predetermined the outcome of the MDR is particularly evident from Ms. Allison's testimony: she stated that because she had "heard

-28-

such lovely things about Kevin" before the MDR hearing, she wanted to find that his conduct had been a manifestation of his disability. Ms. Allison nonetheless testified that after the MDR hearing, she had no choice but to conclude that Kevin's conduct was not a manifestation of his disability. *Id.* at 546. Ms. Wallace also openly struggled with her decision during the hearing, as both she and Kevin's father testified. *Id.* at 355, 64. The record also reflects that plaintiffs were afforded an opportunity to participate in the MDR hearing, that team members carefully discussed Kevin's background and his role in the paintball incident, and, only at the conclusion of the meeting, did the committee members conclude that Kevin's conduct was not a manifestation of his disability. This record thus reflects not prejudgment, but open-mindedness. Accordingly, plaintiffs' final procedural claim is therefore without merit.

## IV.

Given that no procedural violations occurred, it follows that Kevin was not denied a FAPE based on any of the alleged violations, and the only remaining question is whether the IHO's affirmance of the MDR committee's manifestation determination was correct. In this regard, a district court must engage in a modified *de novo* review, giving due weight to the administrative findings but ultimately making an "independent decision based on the preponderance of the evidence." *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 103 (4th Cir. 1991). The application of this standard here compels the conclusion that the determination of the MDR committee, upheld by the IHO, was correct.

First, as the IHO correctly noted, Kevin's anxiety was the "primary basis for his disability classification," rather than the occasional "juvenile outburst[s]" of acting inappropriately in class with friends. IHO Opinion at 23. The evaluations setting forth Kevin's eligibility under the IDEA

described his headaches and school absences, but noted no social problems; indeed, Kevin was described as "academically capable and socially popular." March 2004 Psychological Evaluation at 5. The only evidence of any behavioral problems demonstrated that Kevin sometimes made minor poor choices to impress his friends. For instance, Kevin's 2005 and 2006 IEPs, both of which noted that Kevin had "been drawn into inappropriate behaviors in some of his classes and has been known to be negative and sarcastic toward teachers," suggested that Kevin "refrain from conversation with peers that is not on topic of class lesson" and "distance himself from peers who are behaving inappropriately in class." In addition, at the due process hearing, two of Kevin's teachers testified that Kevin was often persuaded by other students to engage in inappropriate behavior, such as laughing, talking out of turn, or otherwise causing classroom distractions. Such in-class juvenile outbursts to impress friends is not atypical of teenage boys in general.

Even assuming Kevin's disability did cause him to be drawn into inappropriate behaviors at times, the record makes pellucidly clear that far from being drawn into the paintball shooting incident, Kevin played a predominant role in planning and executing it. Specifically, the record reflects that Kevin (i) suggested the idea of shooting the school with paintball guns; (ii) offered to drive the boys there; (iii) used a paintball gun stashed in his own car; and (iv) drove to the school not once, but three times, as he had to drive the boys to get supplies to fix a broken paintball gun and later had to take two boys home who no longer wanted to participate. The entire incident lasted over several hours. Nothing in these facts supports plaintiffs' conclusion that Kevin was impulsively drawn into the paintball incident by his friends as a result of his disability. Indeed, as the IHO pointed out, neither Kevin nor his parents ever suggested at the MDR hearing that Kevin had been drawn into his misconduct by his friends. Kevin simply made a bad decision; he must now live with

the consequences.

Finally, the IHO's determination that the live testimony of Ms. Hamilton was more credible than the written reports and letters submitted by Kevin's parents is entitled to due weight. *J.P. ex rel. Peterson v. County Sch. Bd. of Hanover County, Va.*, 516 F.3d 254 (4th Cir. 2008). Plaintiffs submitted reports and letters from several individuals, none of whom testified at the due process hearing or was subject to cross-examination.[24] These reports were all solicited by Kevin's parents after the MDR hearing for the purpose of undermining the MDR's result and were based entirely on plaintiffs' versions of the facts; these reports are thus less likely to be objective. Moreover, as Ms. Hamilton pointed out during her testimony, Dr. Waaland's report was based on a factual version of the paintball shooting incident that was inconsistent with the version set forth by Mr. Eberling and Officer Davis. Thus, even if these reports about Kevin's tendency to be drawn into inappropriate behavior are credited, they are, as the IHO correctly concluded, unpersuasive as the facts of the paintball shooting incident convincingly demonstrate Kevin was not drawn into the misconduct by his friends, but was instead an instigator and leader of the event. Accordingly, the IHO's determination that the MDR committee correctly found Kevin's conduct not to be a manifestation

---

[24] These reports included a report from Dr. Pamela Waaland, who evaluated Kevin two months after his MDR hearing and found that Kevin's "two most prominent personality characteristics are submissiveness and conformity"; given this, she "unequivocally view[ed] Kevin's infraction . . . as related to his disability." Dr. Jeanine R. Carlson, a clinical psychologist who had conducted family counseling sessions with plaintiffs in 2004, wrote a one-page letter stating that "Kevin in no way displayed issues of character or delinquency during my therapeutic work with him." A letter from Dr. James McMurrer, who has been treating Kevin since September 2003, noted that Kevin had "clear symptoms" of ADHD and expressed Dr. McMurrer's view that the paintball incident "seemed related to Kevin's social immaturity and low self-confidence where he was easily led by a group of teens he was trying to befriend." Additionally, a letter from Dr. William McClintock said that Kevin's anxiety, depression, and "impulsivity and obsessiveness related to his Tourette [sic] syndrome have led to Kevin participating in some activities that on closer reflection he probably would not have."

of his disability is supported by a preponderance of the evidence, and plaintiffs' claim must fail.

An appropriate Order will issue.

Alexandria, Virginia
May 23, 2008

/s/

T. S. Ellis, III
United States District Judge

-32-